*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TYLER MAURICE TATE,

        Defendant-Appellant.

UNPUBLISHED
January 5, 2023

No. 338360
Wayne Circuit Court
LC No. 16-010656-01-FJ

## ON REMAND

Before: M. J. KELLY, P.J., and MARKEY and SHAPIRO, JJ.

PER CURIAM.

Defendant Tyler Maurice Tate was convicted of first-degree premeditated murder, MCL 750.316(a)(1), making a false report of a felony, MCL 750.411a(1)(B), and lying to a police officer in a criminal investigation, MCL 750.479c(2)(d)(*i*). The convictions arose from Tate's involvement in a gang-related shooting that resulted in the death of Tyrell Lane. Tate volunteered to lure Lane from a shopping mall to an area outside the mall where Tate's co-defendant, Brendon Stanton-Lipscomb, planned to shoot him. After Tate led Lane outside, Stanton-Lipscomb shot Lane dead and fled in a vehicle driven by co-defendant, Demetrius Armour. At the time of the offense, Tate was 16 years old. On April 24, 2017, the trial court, pursuant to MCL 769.25, sentenced Tate to concurrent prison terms of 40 to 60 years for the murder conviction and one to four years each for the remaining convictions. Tate appealed his convictions and sentences. This Court affirmed.[1]

Thereafter, Tate applied for leave to appeal to our Supreme Court, which directed oral argument on the application and consolidated his case with *People v Boykin*, unpublished per curiam opinion of the Court of Appeals, issued July 14, 2005 (Docket No. 253224). Subsequently, in *People v Boykin*, ___ Mich ___; ___ NW2d ___ (2022) (Docket Nos. 157738 and 158695)

---

[1] *People v Tate*, unpublished per curiam opinion of the Court of Appeals, issued September 20, 2018 (Docket No. 338360).

(*Boykin*); slip op at 1, the Court held that sentencing courts must consider a juvenile offender's youth as a mitigating factor at sentencing hearings conducted under MCL 769.25 when the juvenile offender is sentenced to a term of years. The Court vacated Part V of our opinion in *Tate* and remanded to this Court for reconsideration. *Id*. at ___; slip op at ___. In doing so, the Court noted that in Part V of this Court's opinion, we identified ways in which the trial court gave consideration to Tate's attributes of youth, but held that:

> [a]ssuming that these statements comply with our requirement that youth must be a mitigating factor, *they appear to only represent a small portion of the record established by the sentencing court. It bears repeating that youth is a mitigating factor at sentencing, not an aggravating factor.* Although trial courts are not required to make a record that they considered each mitigating factor listed in *Miller* when sentencing these defendants, *whether these statements and the totality of the record established by the trial court comply with our requirement that a trial court consider youth to be a mitigating factor is a close question deserving of additional appellate review.* [*Id*., ___ Mich at ___; slip op at 18-19 (emphasis added).]

In accord with the Supreme Court's directive, we have reviewed the entirety of the sentencing record, including the statements made by the prosecutor and the victim's mother, the arguments made by the defense, the presentence investigation report (PSIR), Tate's statement to the court, and the court's remarks in support of its sentencing decision. Based on that record, it is apparent that the trial court considered Tate's youth as a mitigating factor when it sentenced him. Although the court did not articulate on the record how Tate's youth affected the overall sentencing decision, our Supreme Court explained in *Boykin* that, notwithstanding the directive to consider youth as a mitigating factor, the trial court need not "articulate on the record how a defendant's youth affected the [sentencing] decision." *Id*. at ___; slip op at 1. Accordingly, because the trial court considered youth as a mitigating factor, we affirm.

## I. STANDARD OF REVIEW

Tate argues that the trial court did not adequately consider his youth as a mitigating factor. We review for an abuse of discretion a trial court's sentencing decision under MCL 769.25. *Boykin*, ___ Mich at ___; slip op at 6. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

## II. *BOYKIN*

In *Boykin*, the Supreme Court observed that within MCL 769.25 and MCL 769.25a, "there is a range of sentencing outcomes," whereby "[u]nless the prosecution moves to sentence a defendant to life in prison without the possibility of parole, juvenile defendants who are convicted of certain enumerated acts may receive a minimum sentence of 25 to 40 years and a maximum sentence of 60 years." *Boykin*, ___ Mich at ___; slip op at 8. Sentencing a juvenile offender for first-degree murder requires the court to "think differently about how we sentence juvenile offenders" even in light of the extreme severity of the offense. *Boykin*, ___ Mich at ___; slip op at 8. When the prosecution timely moves to have the court consider a sentence of life without the possibility of parole, the sentencing court must hold a hearing and explicitly consider the attributes

of youth identified in *Miller v Alabama*, 567 US 460, 477-478; 132 S Ct 2455; 183 L Ed 2d 407 (2012). *Boykin*, ___ Mich at ___; slip op at 14, citing MCL 769.25(6) and (7). Likewise, when imposing a term-of-years sentence under MCL 769.25 and MCL 769.25a, the trial court must also consider youth as a mitigating factor. *Boykin*, ___ Mich at ___; slip op at 17. That, is, the sentencing court must consider "youth and its attendant circumstances" before imposing a term-of-year sentence for a juvenile offender sentenced under MCL 769.25 and MCL 769.25a. *Boykin*, ___ Mich at ___; slip op at 11.

Identified differences between juvenile and adult offenders include "(1) juveniles have a lack of maturity and an underdeveloped sense of responsibility, which often results in impetuous and ill-considered actions and decisions; (2) juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure, and (3) the character of a juvenile is not as well formed as that of an adult." *Boykin*, ___ Mich at ___; slip op at 9 (quotation marks and citations omitted). The *Boykin* Court clarified that youth as a mitigating factor necessarily impacts the general sentencing considerations stated in *People v Snow*, 386 Mich 586; 194 NW2d 314 (1972). The *Snow* considerations are: "(1) 'reformation of the offender'; (2) 'protection of society'; (3) 'disciplining of the wrongdoer'; and (4) 'deterrence of others from committing like offenses.' " *Boykin*, ___ Mich at ___; slip op at 12, quoting *Snow*, 386 Mich at 592. The *Boykin* Court addressed how each of the *Snow* considerations related to a defendant's youth. *Boykin*, ___ Mich at ___; slip op at 12. Namely, juvenile offenders have a greater possibility of reforming their characters, and such offenders' capacity to change lessens their future risk of harm to others. *Boykin*, ___ Mich at ___; slip op at 12. The sentencing and reviewing courts should therefore " 'not presume that most juveniles will forever remain the "murderers" they once were.' " *Boykin*, ___ Mich at ___; slip op at 12-13, quoting *Jones v Mississippi*, 593 US ___; 141 S Ct 1307, 1337 n 7; 209 L Ed 2d 390 (2021) (SOTOMAYOR, J, dissenting). Thus, youth and its potential for reform moderate the need for harsh discipline. *Boykin*, ___ Mich at ___; slip op at 12-13. Youth also diminishes the effectiveness of deterrence because "the same characteristics that render juveniles less culpable than adults . . . make them less likely to consider potential punishment." *Boykin*, ___ Mich at ___; slip op at 13 (quotation marks and citation omitted). The Court concluded that "[g]iven that youth is a mitigating factor, it will inevitably factor into *Snow*'s four considerations." *Id*.

The Court held, however, that trial courts are not required to "articulate their bases for considering an offender's youth during sentence hearings conducted under MCL 769.25 and MCL 769.25a in which the offender is sentenced to a term of years." *Boykin*, ___ Mich at ___; slip op at 13-14. Instead, although the sentencing court is required to consider the proportionality of its sentence in relation to the offense and the offender, "there is no authority that imposes a higher standard of articulation regarding youth beyond our general requirement that a trial court must adequately explain its sentence on the record in order to facilitate appellate review." *Id*. at ___; slip op at 20. Additionally, the Court quoted, with approval, the following holding from *Jones*, 593 US ___; 141 S Ct at 1319:

> [A]n on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth. Jones's argument to the contrary rests on the assumption that meaningful daylight exists between (i) a sentencer's discretion to consider youth, and (ii) the sentencer's actual consideration of youth. But if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily

*will* consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth. Faced with a convicted murderer who was under 18 at the time of the offense and with defense arguments focused on the defendant's youth, it would be all but impossible for a sentencer to avoid considering that mitigating factor. [*Boykin*, ___ Mich at ___; slip op at 16-17.]

### III. APPLICATION OF *BOYKIN* TO TATE'S SENTENCE

As indicated above, the Supreme Court directed that this Court consider the whole record when evaluating whether the trial court considered Tate's youth as a mitigating factor. *Boykin*, ___ Mich at ___; slip op at 18-19. Specifically, we have considered the totality of the sentencing record, including the arguments raised by the prosecution and the defense, the PSIR, Tate's statement to the court, and the court's remarks in support of its sentencing decision.

A PSIR was prepared before sentencing. The PSIR states:

> As previously mentioned, the defendant was born to the relationship of James Tate and Rose Thomas. The defendant disclosed that her [sic] father died when he was eight years old. The defendant stated his mother lived together [with] Deshawn Walker shortly thereafter. As previously mentioned Mr. Walker is incarcerated. The defendant described a pleasant upbringing under the guise of his mother and step-father. The defendant is the oldest child in a sibship of six. He reports his mother was loving and caring, and he enjoyed a good childhood. The defendant attributes his criminal activity to gang involvement. He stated he chose to join a gang because that's what kids do in his neighborhood. The defendant stated his mother did not like it but he is head strong and he did as he wished. The defendant did not express remorse regarding his behavior.

Tate had no employment record. He "was supported by his mother and step-father, and with the proceeds from marijuana sales." Tate was expelled from middle school in the eighth grade for "doing sexual things with the young women in school." He was then home-schooled. Tate was adjudicated in juvenile court for home invasion and felony-firearm in 2014. He was placed on probation. Tate reported occasional THC use from 2011 to 2015. He received outpatient substance abuse treatment as part of his juvenile placement in 2014. He also completed six months of outpatient treatment in 2016 at the Starr Commonwealth Juvenile Facility.

At the sentencing hearing, Tate's lawyer stated that, having reviewed the PSIR with Tate, there were no substantive corrections to the report. Thereafter, the prosecutor noted that it was seeking a term-of-year sentence of 40 to 60 years' incarceration in lieu of a life without parole sentence. Lane's mother also addressed the court. She stated that her son's murder was "an adult crime, that was intentionally, well thought out," and therefore deserving of "adult time." She stated that Tate showed no remorse for his role in the murder of her son. Instead, he "lied about it," "played games about it" and "laughed about it."

Tate's lawyer argued that a minimum term of 25 years was appropriate. In doing so, Tate's lawyer argued that Tate's youth was a reason for leniency. He noted that Tate was offered a plea agreement in which he would have been sentenced to a minimum term of 20 or 25 years, but he

-4-

rejected the offer because "twenty years was beyond his ability to even comprehend." Tate's lawyer asserted that with young offenders that "they just cannot fathom what twenty years is, because they haven't lived that long." He then argued that a 25-year sentence would be a substantial sentence and that, if Tate did not demonstrate that he had rehabilitated himself, the Parole Board would deny parole, thereby subjecting Tate to more punishment and inducing him to focus on reformation and rehabilitation. Tate's lawyer expressly argued that the objectives of sentencing would be served by a 25-year minimum sentence. The sentence was long enough to protect society because Tate would not be granted parole unless he demonstrated rehabilitation. The objective of deterrence would not be undermined by a 25-year sentence because Tate's conviction was enough to warn other gang members of the consequences of gang violence. Additionally, Stanton-Lipscomb (the shooter) was sentenced to life imprisonment, and Armour (the getaway driver) was sentenced to a minimum term of 40 years. Tate's lawyer explained that he had advised Tate not to express remorse because Tate wanted to maintain his innocence as a legal position. Finally, Tate's lawyer stated that Tate had been cooperative and respectful toward him.

Tate was given the opportunity to speak. He stated:

> I just want to apologize to them for losing their child, 'cause I know how it feel to lose somebody, that's close to them, that they raised.
>
> But I'm not the person that did it.
>
> But, I was the wrong place, the wrong time.
>
> I just wanted to apologize.

The trial court remarked that it had presided over the three trials related to Lane's murder. The court stated:

> The evidence has shown to the jury, beyond a reasonable doubt, that when Mr. [Tyshon] Taylor declined to participate in this plan to murder Mr. Lane, that Mr. Tate volunteered to walk this young man through the Eastland Mall, through the Burlington Coat Factory, to an assassin's bullet.
>
> The Court does understand that Mr. Tate did not start the process of this execution, but he certainly participated in the plan of killing this young man.

The court remarked that Tate was seen in surveillance video walking Lane outside the mall, making it easy for Stanton-Lipscomb to kill Lane. Tate knew his actions were wrong. He hid from law enforcement and boasted that the police could not find him. The court expressly considered Tate's age and maturity and the effect that it may have had on his decision to participate in the murder of Lane. The court stated:

> This Court . . . cannot comprehend why you would volunteer to participate in this execution.

Was it thrill seeking?  Was it an opportunity to be the man, and enhance your reputation, in your community?

I have no idea.

But the fact is, that perhaps your age, and your maturity, were working against you.

But in our civilized society, you're [sic] actions, despite your age, do not make your actions forgivable.

Once again, you knew exactly what you were doing.

The court referenced Tate's Facebook posts denying any involvement in the murder.  The court found that the Facebook messages "show no remorse, and show that you are, indeed, a violent, deplorable young man who will continue to be violent, if allowed to do so."  Tate demonstrated a "very active role in the cold and calculated assassination" of Lane.  He also victimized both his own family and Lane's family.  The court concluded that Tate "ruined [his] own life, by [his] own design."  In light of those considerations, the court held that "the only reasonable and appropriate" sentence was 40 to 60 years.

In his supplemental brief on remand, Tate states that his mother's live-together partner had a criminal record.  He also emphasizes the "corrosive family and neighborhood influences that surrounded" him up until to the time of the murder.  Yet, this statement is not fully consistent with his (undisputed) statements in the PSIR that he had a good family environment and that his mother tried to discourage him from joining a gang.  It is only on appeal that he claims that his "incomprehensible" behavior is not evidence of intractable character, but transient immaturity.  Tate states that the trial court's insistence that he was a "deplorable young man" who would "continue to be violent" reflected the trial court's "refusal to grapple with [Tate's] youth or acknowledge his prospects for rehabilitation."  Tate also asserts that he had only a limited role" in the murder, which did not put him on par with the worst offenders.

Notwithstanding Tate's argument in his supplemental brief, the trial court's statements regarding Tate's culpability properly focused on contrasting the purposefulness of his actions from the expectation that a young offender will act impulsively or under influence.  See *Boykin*, ___ Mich at ___; slip op at 9 (quotation marks and citation omitted) (noting that juvenile offenders "have a lack of maturity and an underdeveloped sense of responsibility, which often results in impetuous and ill-considered actions and decisions").  The fact that the court first considered that Tate's youth and maturity might have been acting against him, but then contrasted that possibility with the purposefulness of his actions, is sufficient to show that the court considered this aspect of youth as a mitigating factor.  The court's finding that Tate's actions, notwithstanding his youth and maturity, were purposeful and not the result of impulsivity is supported by the record.  Stanton-Lipscomb did not pressure Tate into participating.  Tate volunteered after Taylor refused.  Tate had time to reflect on his actions while waiting for Stanton-Lipscomb to arrive, but he followed through with the plan.  Afterward, he bragged that he had not gotten caught.

Tate emphasizes in his supplemental brief that he was unduly influenced by Stanton-Lipscomb's age and status as a gang leader, but Stanton-Lipscomb was not in proximity to Tate when Tate volunteered to escort Lane outside despite his awareness of the plan to shoot him. Stanton-Lipscomb did not initiate the contact with Tate. Tate emphasizes that he was only an aider or abettor, but Tate aided the murder by leading an unsuspecting victim directly to Stanton-Lipscomb's ambush. He is not comparable, for example, to a defendant who aids an armed robbery that results in an unplanned killing.

Tate argues that the senselessness of killing a teenager as punishment for disparaging a gang demonstrates that he acted out of immaturity and not out of cruelty ingrained in his character. However, immaturity and cruelty are not mutually exclusive characteristics. The Legislature established a 15-year range for a juvenile offender's minimum sentence, ostensibly because not all juvenile offenders have the same capacity for reformation. Tate's willingness to participate and lack of remorse can be construed as indications that he has a lower capacity. Based on the record before the court, the trial court's conclusion that Tate's capacity for reformation was low in relation to the goals of deterrence, punishment, and protection of society was not unjustified.

Tate argues that allowing him the chance to demonstrate reformation will not jeopardize the goal of protecting society because he can be denied parole if he fails to reform. Tate's trial lawyer made this same argument in support of his request for a 25-year minimum sentence. As such, it is a factor that the trial court necessarily considered as a mitigating circumstance. See *Boykin*, ___ Mich at ___; slip op at 16-17 (noting that if a defense lawyer advances an argument based on the defendant's youth, "the sentencer *will* consider the defendant's youth."), quoting *Jones*, 593 US at ___; 141 S Ct at 1319. Thus, although this would have been an option available to the trial court, the court was not required to choose that option and its failure to do so does not mean that it failed to consider youth as a mitigating factor.

In sum, albeit not entirely expressly, the court considered youth to be a mitigating factor but, in light of the record, it also made the reasonable determination that the attributes of youth did not outweigh Tate's deliberation and voluntariness in carrying out the act. Therefore, the court did not err by finding that Tate's case was among the circumstances that justified sentencing a juvenile offender at the high end of the specified range in MCL 769.25.

Affirmed.

/s/ Michael J. Kelly
/s/ Jane E. Markey